UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80473-CIV-MARRA/HOPKINS

J.P.M., individually, and as next best
friend for C.M., R.G.M., individually,
and as next best friend for C.M., and
C.M., a minor,

      Plaintiffs,

vs.

PALM BEACH COUNTY SCHOOL BOARD,
a political subdivision or agency, ARTHUR
JOHNSON, Ph.D., in his official [capacity]
as Superintendent of Palm Beach County
Schools, LAURA PINCUS, in her official
capacity of Director of Exceptional Student
Services, JOANNE THORNTON, in her
official and individual capacities,

      Defendants.

_____/

### ORDER AND OPINION ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon the Official-Capacity Defendants' Motion

for Summary Judgment [DE 42] and Defendants' Motion for Summary Judgment on

State Law Tort Claims [DE 43].  The motions are on behalf of Defendant Palm Beach

County School Board ("the School Board").[1]  The Court has carefully considered the

motions, responses, replies, entire court record, oral argument of counsel, and is

_____

[1] Defendants Arthur Johnson, Ph.D., Laura Pincus and Joanne Thornton also
were movants.  However, subsequent to the briefing of the motion, these defendants
settled.  The Court has been advised that it need only consider the filings as they
relate to the School Board.  *See* DE 73.

otherwise fully advised in the premises.

## INTRODUCTION

This matter is about an autistic Exceptional Student Education ("ESE") student enrolled in the Palm Beach County School District.  His initials are C.M.  C.M.'s parents, J.P.M. and R.G.M., are the Plaintiffs.  Plaintiffs allege violations of C.M.'s rights under federal and state laws.  They seek compensatory and punitive damages, as well as injunctive relief, against the School Board for allegedly subjecting C.M. to years of excessive and improper restraints while attending Lantana Middle School. Plaintiffs contend C.M. was placed in a residential facility for psychological treatment to overcome the trauma of being restrained.  The School Board moves for summary judgment as to all federal and state claims.

## UNDISPUTED MATERIAL FACTS

1.    At all times material to this case, C.M. was enrolled as a student in the Palm Beach County School District and was designated early on in his life by the School Board as being "educable mentally handicapped."  First Amended Complaint ("Compl."), DE 26 at ¶¶ 6, 19.

2.    C.M. suffers from a genetic disability called Cornelia de Lange Syndrome, which affects physical and mental development, as well as autism, obsessive compulsive disorder, social anxiety, sensory disorder, simple and complex

motor and vocal tics,[2] and gastrointestinal reflux ("acid reflux").  DE 26, ¶ 21;

DE #s 42, 48-1.  While C.M. is verbal and can engage in a short conversation,

his disabilities present problems with expressive language and prohibit him

from communicating clearly.  Compl. ¶ 21; Ex. O at 37-38.

3.      "C.M. is small in stature, underweight, physically delayed, and pretty frail."

DE 48-1, ¶ 27.

4.      C.M. started exhibiting behavior issues in early elementary school (in school

only).  DE #s 42, 48-1.  In the sixth grade, C.M. was having significant incidents

of self-injurious behavior (i.e., biting his own arm) and physical aggression

(i.e., hitting and kicking) teachers, staff and students.  Pam Tepsic[3] ("Tepsic")

---

[2] Motor tics observed by Ruth Myers, M.D. include head jerks, shoulder jerks, truncal jerks, tugs at hair, and twisting the shoulders.  Vocal tics include shrieks and sniffs.  C.M. attempts to restrain himself by crossing his ankles firmly, flattening his right hand, twisting the fingers on his left hand against his right hand to prevent movement, and gritting his teeth.  Ex. 3 at 8 of 17 (DE 48-15).  Dr. Myers opines, "I think that [C.M.] was very concerned about not wanting to hurt other people or get into trouble and he used some personal management strategies over the years to develop restrained tics or to discharge tic impulses at more appropriate times.  However, I think at times he would self-restrain these tics, jerking movements and vocalizations to the point where the impulses accumulated and he would have flurries of flailing of his arms, kicking, spitting, biting, all kinds of other tics that were the result of accumulated tic impulses."  Ex. S at 32.

[3] Ms. Tepsic is the School Board's Rule 30(b)(6) designee "regarding any and all policies, directives, rules, ordinances, laws or internal memorandum involving the use, implementation and training provided to employees regarding any form of physical restraint or hold, including Professional Crisis Management ("PCM") techniques, TEAM and VITAL and the use of any restraint of hold on C.M."  Ex. 3 8-11

Depo., Ex. 3 at 20; Joann Thornton[4] ("Thornton") Depo., Ex. C at 233.  "C.M.'s

aggression towards others is a learned behavior."  DE 48-1, ¶ 29.

5.      School records indicate that it was necessary to restrain C.M. to avoid injury to

himself or others.  Ex. I.  Each time C.M. was restrained, it was due to a

perceived crisis, rather than part of his behavioral management plan.  4/24/12

Hearing Transcript at 17, 71-73; Ex. 8.  C.M. was first restrained on March 17,

2004, when C.M. was in sixth grade.  Tepsic Depo., Ex. 3 at 15.  The restraint

logs from C.M.'s sixth grade are missing.  Ex. A at 129-30; Ex. L at 166.  The

only evidence of C.M. being restrained is the PCM Physical Assistance Logs

found in Ex. K.  At oral argument, it was stated by way of explanation that all

instances of restraint consisted of someone holding CM, for instance, either his

hands and/or his feet (without twisting his arms), and no mechanical restraint

was ever used on C.M.  4/24/12 Hearing Transcript at 14.

6.      For purposes of this motion only, the School Board concedes that, over a 14

month period of time, there were 89 incidents of restraint with 27 prone

restraints being documented.

_____

[4] Ms. Thornton was the School Board's Rule 30(b)(6) designee in the DOAH
proceedings designated to testify as to the development and implementation of any
plan or program used to address the behavioral and discipline issues of C.M.,
including behavioral assessments, behavioral management plans, behavioral
interventions, positive behavioral techniques, compliance with the District's
Behavioral Management Procedures and the IDEA, any action or inaction taken by the
Behavior Review Committee, and implementation of same into C.M.'s Individual
Educational Plan.  Ex. 2 at 116; Ex. 4 at 6.

7.      After three restraints are performed within one month, a child's Functional
Behavioral Assessment ("FBA") must be reviewed, and updated if appropriate.
Ex. G; Thornton Depo. Ex. C at 174-75.  After three restraints were placed on
C.M., a new FBA was not conducted because "we knew what the function was
for him . . . but we did meet to go over the plan to see what was working and
what wasn't working.  After awhile we also - I requested that we have Merrill
Winston come in the capacity of a certified behavior analyst to help us out."
Thornton Depo. Ex. C at 174-75.

8.      The form of the majority of restraints performed on C.M. was taken from the
theories and instructions of the Professional Management Crisis Association
("PCMA").[5]  PCM is a behaviorally-based system using natural physical positioning
that avoids awkward movements.  Ex. H at 45.  PCM was adopted as the School
Board's policy on restraints or immobilization and PCMA has trained the School
Board's personnel to perform PCM techniques on students for 17 years.  Ex. 7 at
172-73.  Under PCM, if a student tries to hit, punch, or kick another, staff
attempts to deflect and transport, rather than restrain the student.  Ex. 3 at 24.
Sometimes, however, the student's physical aggression escalates quickly,
requiring the child to be restrained.  Ex. 3 at 57-58.

9.       C.M. "started going downhill" in the middle of seventh grade.  He did not want
to go to school and was crying a lot.  He regressed academically and

_____

[5] PCMA provides crisis management and behavior analysis training,
certification, and  consulting.

behaviorally.  He had sleep problems, phobias and fears, and lost a lot of his communication skills.  He started being aggressive at home.  Ex. A at 67-71.

10.     Pursuant to an Individual Educational Plan ("IEP"), C.M. attended Lantana Middle School for sixth and seventh grades and part of eighth grade.  DE #s 42, 48-1.  A Behavior Intervention Plan ("BIP"), in effect as of April 2004, states: "County approved restraints (TEAM) policies may be used if [C.M.] displays continuous ag[g]ression or high magnitude disruption."  Ex. D, Bates stamp P005555.  There is another copy of the BIP with the word "TEAM" blacked out. A BIP is a working document and changes are usually made by hand.  Tepsic Depo. at 16-17.

11.     Performing a TEAM restraint (now known as VITAL) is a crisis management procedure used by the school police to insure safety and de-escalate target behavior in emergency situations.  Tepsic Depo. at 18-20.; Ex. 7 at 177, Ex. 3 at 17-18, 59.  Thornton recommended that the TEAM restraint technique not be performed on C.M.  Thornton Depo. at 178-79.

12.     During the time period of 2004 through 2007, both PCM and TEAM techniques were used to restrain ESE students.  Tepsic Depo. at 13.  The School Board preferred to use PCM techniques with ESE students, although the written policies did not preclude TEAM techniques.  Exs. H, F, G.

13.     The PCM method does not preclude a horizontal restraint for someone such as C.M., who has gastrointestinal reflux, however, it is contraindicated.[6]  Ex. 5 at 200-02.  C.M.'s reflux condition could impose discomfort or pain when the prone restraint is imposed.  Ex. 5 at 205.

14.     The BIP became a part of C.M.'s IEP and was given to all of C.M.'s teachers and para-professionals.  Tepsic Depo. at 17-18.  It is unknown which version of the BIP was distributed.

15.     One PCM record reveals no reason why C.M. was restrained, who restrained him, or what type of restraint was performed.  Ex. 3 at 27-28.

16.     Another group of school records called "ABC Records," shows the antecedent occurrence ("A"), the behavior ("B"), and the consequence ("C").  One ABC record does not document the antecedent behavior, so it is not possible to tell what conduct of C.M. precipitated the restraint, or what de-escalation techniques were attempted.  Ex. 3 at 23-24.  Other ABC records show numerous instances of aggressive behavior by C.M. and what was done to de-escalate the situation; for example, whether C.M. was restrained or removed from the situation.  Ex. J.  One of these records show a TEAM technique was

---

[6] "Contraindication" means that the person performing the restraint should use extra caution.  Ex. 5 at 213.  All PCM instructors go over the list of contraindications in the PCM manual, and the instructors explain the reflux issue in their training.  Ex. 5 at 202, Ex. 3 at 69.  The reason why prone restraints are contraindicated for people with reflux is that if they are having acid reflux at the time of the restraint, this could cause them pain.  Ex. 5 at 205.

used.

17.  Actual restraint logs show that every restraint performed was in response to C.M.'s physical aggression (continuous), high magnitude disruption (continuous), and/or self-injury (continuous).  Def. Exs. J & K.

18.  School Board policy states, "[i]nterventions used in emergency situations to prevent a student from endangering self or others do not constitute management procedures and do not require parental consent."  Ex. G, Bates stamp P005472.

19.  Drs. Durgin and Myers diagnosed C.M. with post traumatic stress disorder, with the initial traumatizing event believed to be the restraints C.M. experienced at Lantana Middle School.  Ex. 1 at 42, 107-12; Ex. 13 at 10-111; Ex. 10 at 34-35.

20.  In 2009, Plaintiffs commenced an administrative due process proceeding.  The Administrative Law Judge ("ALJ") granted the School Board's motion to dismiss some of the claims that had been pled.  The parties later entered into a settlement.  Among other things, the Settlement and Release Agreement entered into between the parties provided:

> 9.  RESOLUTION OF DOAH CASE 09-1799E:  This AGREEMENT resolves all matters currently at issue and pending in DOAH Case No. 09-1799E; the only issues that can be raised between and among the PARTIES are either: (a) claims for future educational services, or (b) the claims raised by C.M. in the first amended due process petition and dismissed by that certain Order on the School Board's Second

Notice of Insufficiency and its Motion to
Dismiss Amended Complaint entered in DOAH
Case No. 09-1799E on June 5, 2009
("Dismissed Claims").

## Summary Judgment Burdens

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The applicable substantive law identifies which facts are material in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  When the non-moving party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-moving party cannot meet its burden of proof at trial.  *Clark*, 929 F.2d at 606-608 (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the non-moving

party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, when faced with a properly supported motion for summary judgment, the

burden then shifts to the non-moving party who must "go beyond the pleadings," and,

by its own affidavits or by "depositions, answers to interrogatories, and admissions on

file," designate specific facts showing there is a genuine issue for trial.  *Celotex*, 477

U.S. at 324; *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

**DISCUSSION**

Plaintiffs make two statements in their Additional Statements of Undisputed

Material Facts which merit highlighting:  "The issue on restraints is not whether the

restraints were performed correctly, but why [they] were continuing to be used when

it made C.M. worse."  DE 48-1, ¶¶48, 50.  They also state it is undisputed that "[n]o

restraint was performed on C.M. for purposes of punishment or discipline."  DE 48-1 ¶

61, Ex. 6 at 18.

**<u>Section 504 of the Rehabilitation Act</u>**

Count I alleges violation of § 504 of the Rehabilitation Act, which provides in

pertinent part, "[n]o otherwise qualified individual with a disability in the United

States ... shall, *solely by reason of her or his disability*, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a)

(emphasis supplied).  The elements of a claim under the Rehabilitation Act are,

therefore,: "(1) that [he] is a 'handicapped individual' under the Act, (2) that [he] is

Page 10 of  23

'otherwise qualified' for the [benefit] sought, (3) that [he] was [discriminated against] solely by reason of [his] handicap, and (4) that the program or activity in question receives federal financial assistance." *Schiavo ex rel Schindler v. Schiavo,* 358 F. Supp. 2d 1161, 1165 -66 (M.D. Fla. 2005) quoting *Grzan v. Charter Hosp. of Northwest Indiana,* 104 F.3d 116, 119 (7th Cir. 1997).

Plaintiffs allege that the School Board intentionally discriminated against C.M. by refusing to investigate his individual needs, excluding him from participating in educational activities with other non-disabled students, and purposefully provoking him to de-compensation by subjecting him to prolonged and unwarranted restraints. DE 26 ¶ 81.  Plaintiffs assert the School Board acted in bad faith, with gross misjudgment, and deliberate indifference, and they seek an injunction barring the School Board from continuing its policy and practice of performing restraints to address behavioral issues, as well as compensatory and punitive damages, fees and expenses.

The School Board moves for summary judgment as to Count I stating that even if the Court completely accepts Plaintiffs' version of the facts, there is no evidence of intentional discrimination or deliberate indifference.  Under the standard of deliberate indifference, a plaintiff must prove that the defendant knew that harm to a federally protected right was substantially likely and that the defendant failed to act on that likelihood.  *T.W. ex rel. Wilson v. School Bd. of Seminole County, Fla.* 610 F.3d 588, 604 (11th Cir. 2010) ("*T.W.*").

The first question that must be decided is whether the School Board, as the moving party, has carried its initial burden of production, and thus whether Plaintiffs, as the non-moving parties, had an obligation to produce any evidence in response. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Accordingly, if the School Board wishes to prevail, it must present evidence negating an essential element of Plaintiffs' claim or by pointing to specific portions of the record which demonstrate that Plaintiffs cannot meet their burden of proof at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The first question must be answered in the negative. The School Board has not produced any evidence whatsoever regarding whether the para-professionals or teachers who restrained C.M. intended[7] to discriminate against him on the basis of his disability,[8] or knew that it was substantially likely that a violation of his federally

---

[7] The definition of "intentional discrimination" in the § 504 special education context is unclear. In 2010, the Eleventh Circuit stated that it "has not decided whether to evaluate claims of intentional discrimination under § 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (citing *Wood v. Pres. of Spring Hill College*, 978 F.2d 1214, 1218-20 (11th Cir. 1992)). In this case, neither party contends that the discriminatory animus standard applies, and the arguments have been made under the deliberate indifference standard. Accordingly, the court will analyze the claims under that standard, which is a more lenient standard than discriminatory animus. *See J.D.P. v. Cherokee County, Ga. School Dist.*, 735 F. Supp. 2d 1348, 1365 (N.D. Ga. 2010) (analyzing a compensatory damages claim under § 504 using the deliberate indifference standard because the parties argued the case under that standard); *Saltzman v. Bd. of Commis of N. Broward Hosp. Dist.*, 239 F.App'x 484, 487 (11th Cir. 2007) (same).

[8] There is no record evidence whatsoever from any of the people who applied the restraints.

protected rights would occur.  *T.W.*, 610 F.3d at 603-04; *Berg v. Fla. Dep't of Labor &*
*Employment Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998).  The School Board relies
completely on the restraint logs and ABC records at Exs. J & K.  These records show,
for the most part, that C.M. was restrained due to his own aggressive or self-injurious
behavior.  What the records do not and cannot demonstrate is the intent or
knowledge of each person who restrained C.M.

Neither party deposed any of the para-professionals or teachers who restrained
C.M. or signed the restraint logs, although the School Board reports two of them are
still employed by the School Board.  4/24/12 Hearing Transcript at 27.  The School
Board did not submit a single affidavit from any of its staff to support its contention
that it did everything in its power to help and support C.M.  While the School Board is
correct that Plaintiffs have not produced evidence of intentional discrimination or
deliberate indifference, this argument places the initial burden on the wrong party
for purposes of this motion.  As the moving party on a summary judgment motion, the
School Board must support its argument with evidence showing an absence of
intentional discrimination or deliberate indifference on its part.  Having failed to
meet its burden on summary judgment, the motion on Count I alleging a violation of §
504 of the Rehabilitation Act will be denied.

### Substantive Due Process Liability Under 42 U.S.C. § 1983

Count II alleges that C.M. had a liberty interest in his bodily integrity that is
protected under the Due Process Clause of the Fourteenth Amendment.  Plaintiffs

claim that the School Board's acts of repeated physical restraints and acts of

seclusion[9] against C.M. violated that right.[10]  Plaintiffs contend that by authorizing

the repeated restraints, the School Board engaged in arbitrary, egregious, and

conscience-shocking behavior which demonstrates a "deliberate indifference" to the

---

[9]  Plaintiffs argue that "while at Lantana Middle School it was not uncommon for C.M. to be isolated from his classmates, teachers and staff by being left out in (sic) hallway, alone, without supervision, performing no school work.  Ex. 9 at 151-52."  The record citation for this allegation, however, does not support this assertion, and no other evidence is proffered for this allegation.  As this argument is completely unsupported, it is disregarded.

[10]  Plaintiffs assert that the correct standard to determine whether C.M.'s substantive due process rights were violated comes from *Youngberg v. Romeo*, 457 U.S. 307, 330 (1982), which holds that "[l]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  In accordance with this theory of liability, Plaintiffs argue that the School Board departed from accepted professional standards of care by placing TEAM and prone restraints in C.M.'s BIP without parental or medical consent, and by failing to sufficiently document the number of restraints or the antecedent behavior before C.M. was restrained.  Other evidence to which Plaintiffs point is the fact that no FBA was conducted after more than three restraints were performed in a three month period, and that C.M.'s behavior resource teacher did nothing to determine the circumstances behind the restraints from the persons who performed them.
The Court agrees with the School Board that *Youngberg*, dealing with the rights of an involuntarily committed retarded child, is not the appropriate standard for this case.  "*Youngberg* and its progeny firmly established that mentally retarded individuals in state custody have, under the Fourteenth Amendment, liberty interests in 'reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.'"  *F.A. ex rel. Sims v. Hansen*, 2011 WL 4529463, *1 (N.D. Fla. Sept. 29, 2011) quoting *Youngberg*, 457 U.S. at 324.  "[I]in a classroom setting, courts have not allowed due-process liability for deliberate indifference, and, moreover, will only allow recovery for intentional conduct under limited circumstances."  *Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373, 1378 (11th Cir. 2002) (instructing courts to remain vigilant in policing the boundaries separating tort law from constitutional law).

training and supervision of the School Board's subordinates who performed the acts of restraint.  Compl. ¶¶ 86-89.  "It is this blatant disregard of C.M. rights to be free from bodily restraints as provided under the 14th Amendment that proximately caused C.M. to suffer anxiety and trauma that was documented as being a direct result of the restraints at Lantana Middle School."  DE 48 at 8.

Plaintiffs burden at trial for this claim will be to convince a reasonable jury to infer that C.M. was restrained based on an intent to discriminate against him because he has a disability.  It will not be enough to show that C.M. has a disability, the disability caused a problem that had to be addressed, and the School Board responded to the problem dissatisfactorily, or even harmfully.  Liability under the due process clause does not arise merely because someone cloaked with state authority causes harm.  "As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct 'shocks the conscience.'" *Nix*, 311 F.3d at 1375 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998)).  Allegations that a party failed to train, supervise, and discipline its employees do not rise to the level of an "omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992).  Nor do allegations of "deliberate indifference" when they are made in a non-custodial setting such as a classroom.  *See Nix*, 311 F.3d at 1377; *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997) (school children are not in a custodial relationship with the state).

Page 15 of  23

Evidence that records were lost, that a few records are incomplete, that the School Board did not follow policy by failing to conduct a FBA after three restraints were performed on C.M., and that the School Board knew of non-physical means to stop C.M. but restrained him instead, thereby disregarding their own consultant's advice to ignore C.M.'s slapping, does not come close to the required constitutional level of shocking the conscious.  Nor do the other examples Plaintiffs cite.[11]

While the School Board acknowledges that C.M. was restrained a significant number of times, a substantive due process claim is not a valid attack of Defendant's conduct.  Viewing all inferences that could be drawn from all alleged actions or inactions in the light most favorably to Plaintiffs, as a matter of law, these facts do not rise to the requisite conscience shocking level.  There is no record evidence to support the claim that the use of restraints was arbitrary, egregious or excessive in the constitutional sense.  As no reasonable jury could conclude that the School Board's use of restraints was arbitrary, egregious or excessive in the constitutional sense, Count II fails as a matter of law and summary judgment will be granted on Count II.  The Court notes, however, that Plaintiff will be permitted to proceed with

---

[11]  Plaintiffs exaggerate or ignore undisputed facts in their argument.  For example, Plaintiffs argue that TEAM *restraints* were used when it is only documented to have been used once, that ABC *records* were not properly prepared when only one ABC record is incomplete, and complain that restraints were used without parental consent when the school policy that applies does not require parental consent. Furthermore, Plaintiffs state that they do not dispute that C.M. was not restrained for purposes of punishment or discipline, but argue that C.M. was restrained in a punitive manner, for extended periods of time, and often for trivial issues.

Count IV, which also alleges School Board liability under § 1983.

## 42 U.S.C. § 1983, Right to a Free and Appropriate Education under the IDEA[12]

Count IV alleges that the School Board conspired to deprive C.M. of his right to a free and appropriate public education under the Individuals with Disabilities Education Act ("IDEA") by perpetuating and applying an unlawful policy and practice of implementing violative restraints into C.M.'s BIP/IEP, and failing to conduct the necessary and proper assessments and evaluations to determine the necessary and proper accommodations and/or services required under the IDEA to address his disabilities.  DE 26.  The School Board does not attack this count on the basis of Plaintiff's lack of evidence, but relies on two other arguments: (1) it was not preserved by the parties' Settlement and Release Agreement; and (2) a § 1983 claim may not be brought for violations of the IDEA.  This argument fails on both accounts.

Settlement and Release Agreement

In 2009, Plaintiffs initiated a state administrative due process proceeding.  The complaint filed in the administrative proceeding included a § 1983 claim based on alleged excessive restraining of C.M.  On February 12, 2010, Plaintiffs and the School

---

[12]  The IDEA guarantees all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs.  20 U.S.C. § 1400(d)(1)(A); *J.P. v. Cherokee County Bd. of Educ.*, 218 F. App'x 911, 913-914 (11th Cir. 2007); *Sch. Bd. of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir. 2002).

Board entered into a Settlement and Release Agreement ("Agreement").  Ex. V.

Paragraph 9 of that Agreement provides as follows, verbatim:

9.  <u>RESOLUTION OF DOAH CASE 09-1799E</u>:  This AGREEMENT resolves all
matters currently at issue and pending in DOAH Case No. 09-1799E; the
only issues that can be raised between and among the PARTIES are
either: (a) claims for future educational services, or (b) the claims
raised by C.M. in the first amended due process petition and dismissed
by that certain Order on the School Board's Second Notice of
Insufficiency and its Motion to Dismiss Amended Complaint entered in
DOAH Case No. 09-1799E on June 5, 2009 ("Dismissed Claims").

Ex. V at 7.  According to the parties, the § 1983 claim asserted by Plaintiffs in the

DOAH case was based solely on the alleged excessive number of times C.M. was

restrained.  The § 1983 claim being asserted here, on the other hand, derives from an

alleged IDEA violation.  Therefore, while the legal authority for each claim arises

under § 1983, the facts and legal basis supporting the claims are different.

The School Board asserts that the IDEA based § 1983 claim was not raised in the

first amended due process petition and is therefore not preserved by the language

"the only issues that can be raised between and among the parties are . . . claims

raised by C.M. in the first amended due process petition and dismissed."  Plaintiffs

disagree and argue that the Settlement Agreement only resolved those claims "at

issue and pending in DOAH Case No. 09-1799E."   Since a § 1983 claim based upon a

violation of the IDEA was not asserted in the administrative proceeding, Plaintiffs

assert it was not affected by the Settlement Agreement. *See*  DE 48 at 10.

The Court finds that the School Board construes the Settlement Agreement too broadly. The School Board ignores the language of the release that states: "[t]his AGREEMENT resolves all matters currently at issue and pending in DOAH Case No. 09-1799E." This language limits the scope and breadth of the settlement provision. The language following this introductory sentence must be read in light of this limitation. Thus, it is clear that the parties only intended to resolve matters at issue in the administrative proceeding. They did not intend the settlement to constitute a general release of all claims that could have been brought.

The language upon which the School Board relies[13] was not a general release, but rather a recognition that certain claims originally asserted and then dismissed in the DOAH action were not covered by the Settlement. Therefore the Settlement Agreement does not foreclose Plaintiffs' § 1983 claim based on alleged violations of the IDEA, since it was not "currently at issue and pending" in the DOAH case when the settlement was reached.

The School Board's argument that a § 1983 claim may not be brought for violations of the IDEA is rejected. The School Board has not convinced the Court that it should recede from its earlier ruling which recognized such a claim. *See, LMP v. The School Board of Broward County*, Case No. 05-60845-CIV-MARRA, DE #122 (S.D.

---

[13] "the only issues that can be raised between and among the PARTIES are either: (a) claims for future educational services, or (b) the claims raised by C.M. in the first amended due process petition and dismissed . . ."

Fla. Sept. 29, 2006) (under the law in this district, a plaintiff may proceed with a §

1983 claim under the IDEA after exhausting administrative remedies).  Having failed

to meet their burden of persuasion as to Count IV, Plaintiffs may proceed at trial with

this claim.

**Liability under the ADA, 42 U.S.C. § 12132**

　　　　Count VI alleges that the School Board violated the Americans with Disabilities

Act ("ADA") by excluding C.M. from participation in or denying the benefits of,

services, programs, or activities of the School Board by reason of his disability, or

subjecting him to discrimination by reason of his disability.  Section 12132 of the ADA

states "[s]ubject to the provisions of this subchapter, no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. § 12132.

　　　　To establish a prima facie case of discrimination under the ADA, plaintiffs will

have to show (1) that C.M. is a qualified individual with a disability; (2) that he was

excluded from participation in or denied the benefits of the services, programs, or

activities of the School Board or otherwise discriminated against by the School Board;

(3) by reason of such disability.  *L.S. v. School Bd. of Broward County, Fla.*, No.

06-61245-CIV-KAM, 2007 WL 2827575, *7 (S.D. Fla. Sept. 26, 2007) quoting *Shotz v.*

*Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001); *Miller v. King*, 384 F.3d 1248, 1265 (11th

Cir. 2004).  Summary judgment for this count is not appropriate because, as

explained earlier in the section addressing Plaintiffs' claim under the Rehabilitation Act, the School Board has failed to support its motion with evidence negating an essential element of the Plaintiffs' claim or by pointing to specific portions of the record which demonstrate that Plaintiffs cannot meet their burden of proof at trial.

**State Claims**

Count VII alleges Violation of Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* The School Board argues that this claim was not preserved in the parties' Settlement and Release Agreement and asserts the same arguments it made against Counts I and VI. For the same reasons the Court rejected the School Board's earlier arguments on this issue, they are rejected here. Summary judgment is denied as to Count VII.

Count VIII alleges Intentional Infliction of Emotional Distress. The School Board has not shown that there is no genuine issue of material fact as to this claim, and the motion for summary judgment is denied as to this count.

Count IX alleges battery. The School Board has not shown that there is no genuine issue of material fact as to this claim, and Plaintiffs may proceed on this claim. Summary judgment is denied as to this count.

Count X alleges negligence. The sole ground for summary judgment as to this count is that it was not preserved by the parties' Settlement and Release Agreement. For the same reasons stated earlier in this Order in the section addressing the Settlement and Release Agreement, the motion for summary judgment is denied as to

this count and Plaintiffs may proceed with it.

Count XIII alleges false imprisonment.  The School Board argues that § 1012.75, Fla. Stat. forecloses liability on C.M.'s teachers, and if an employee is immune for tort liability by virtue of a state statute, the employee's governmental employer cannot be held liable.  The School Board cites *Brown v. City of Huntsville, Ala,* 608 F.3d 724 (11th Cir. 2010) for this proposition.

The Plaintiffs respond that Defendant's reliance on § 1012.75, Fla. Stat. is waived since it was not plead as an affirmative defense.  The Court agrees.  *See* Order Denying Motion to Amend Affirmative Defenses [DE 65].  Accordingly, summary judgment is denied as to this count.

## Punitive Damages

The School Board correctly asserts that punitive damages may not be awarded in private suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act. *Barnes v. Gorman,* 536 U.S. 181, 189-190 (2002).  The Court reserves ruling on the question of punitive damages under § 1983.  Therefore, in accordance with the findings made herein, it is hereby

**ORDERED AND ADJUDGED** that the Official-Capacity Defendants' Motion for Summary Judgment **[DE 42] is granted in part and denied in part** as explained above; and Defendants' Motion for Summary Judgment on State Law Tort Claims **[DE 43] is denied**.  Plaintiffs agreed during oral argument that Count III, alleging violation of Fla. Stat. § 1003.57, was settled in the underlying administrative proceeding.

4/24/12 Hearing Transcript at 59.  Accordingly, Count III is dismissed.

**PLEASE TAKE NOTE THAT THIS MATTER IS SET FOR A STATUS CONFERENCE**

**on Friday, July 27, 2012 at 10:00 A.M.** before the undersigned, in Courtroom 4 (3rd

floor) at the Paul G. Rogers Federal Building and U.S. Courthouse, 701 Clematis

Street, West Palm Beach, Florida.  Counsel who wish to appear by telephone may

contact Irene Ferrante at 561-514-3765.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 6th  day of July, 2012.

                        _____

                        KENNETH A. MARRA
                        United States District Judge