UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80473-CIV-MARRA/HOPKINS

J.P.M., individually, and as next best
friend for C.M., R.G.M., individually,
and as next best friend for C.M., and
C.M., a minor,

       Plaintiffs,

vs.

PALM BEACH COUNTY SCHOOL BOARD,
a political subdivision or agency, ARTHUR
JOHNSON, Ph.D., in his official [capacity]
as Superintendent of Palm Beach County
Schools, LAURA PINCUS, in her official
capacity of Director of Exceptional Student
Services, JOANNE THORNTON, in her
official and individual capacities,

       Defendants.

_____/

## AMENDED ORDER AND OPINION ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon the Official-Capacity Defendants' Motion

for Summary Judgment [DE 42] and Defendants' Motion for Summary Judgment on

State Law Tort Claims [DE 43].  The motions are on behalf of Defendant Palm Beach

County School Board ("the School Board").[1]  The Court has carefully considered the

motions, responses, replies, entire court record, oral argument of counsel, the School

_____

[1] Defendants Arthur Johnson, Ph.D., Laura Pincus and Joanne Thornton also
were movants.  However, subsequent to the briefing of the motion, these defendants
settled.  The Court has been advised that it need only consider the filings as they
relate to the School Board.  *See* DE 73.

Board's Motion for Reconsideration, and is otherwise fully advised in the premises.

## INTRODUCTION

This matter is about an autistic Exceptional Student Education ("ESE") student enrolled in the Palm Beach County School District.  His initials are C.M.  C.M.'s parents, J.P.M. and R.G.M., are the Plaintiffs.  Plaintiffs allege violations of C.M.'s rights under federal and state laws.  They seek compensatory and punitive damages, as well as injunctive relief, against the School Board for allegedly subjecting C.M. to years of excessive and improper restraints while attending Lantana Middle School. Plaintiffs contend C.M. was placed in a residential facility for psychological treatment to overcome the trauma of being restrained.  The School Board moves for summary judgment as to all federal and state claims.

## UNDISPUTED MATERIAL FACTS

1.    At all times material to this case, C.M. was enrolled as a student in the Palm Beach County School District and was designated early on in his life by the School Board as being "educable mentally handicapped."  First Amended Complaint ("Compl."), DE 26 at ¶¶ 6, 19.

2.    C.M. suffers from a genetic disability called Cornelia de Lange Syndrome, which affects physical and mental development, as well as autism, obsessive compulsive disorder, social anxiety, sensory disorder, simple and complex

motor and vocal tics,[2] and gastrointestinal reflux ("acid reflux").  DE 26, ¶ 21;

DE #s 42, 48-1.  While C.M. is verbal and can engage in a short conversation,

his disabilities present problems with expressive language and prohibit him

from communicating clearly.  Compl. ¶ 21; Ex. O at 37-38.

3.      "C.M. is small in stature, underweight, physically delayed, and pretty frail."

DE 48-1, ¶ 27.

4.      C.M. started exhibiting behavior issues in early elementary school (in school

only).  DE #s 42, 48-1.  In the sixth grade, C.M. was having significant incidents

of self-injurious behavior (*i.e.,* biting his own arm) and physical aggression

(*i.e.,* hitting and kicking) teachers, staff and students.  Pam Tepsic[3] ("Tepsic")

---

[2]  Motor tics observed by Ruth Myers, M.D. include head jerks, shoulder jerks, truncal jerks, tugs at hair, and twisting the shoulders.  Vocal tics include shrieks and sniffs.  C.M. attempts to restrain himself by crossing his ankles firmly, flattening his right hand, twisting the fingers on his left hand against his right hand to prevent movement, and gritting his teeth.  Ex. 3 at 8 of 17 (DE 48-15).  Dr. Myers opines, "I think that [C.M.] was very concerned about not wanting to hurt other people or get into trouble and he used some personal management strategies over the years to develop restrained tics or to discharge tic impulses at more appropriate times.  However, I think at times he would self-restrain these tics, jerking movements and vocalizations to the point where the impulses accumulated and he would have flurries of flailing of his arms, kicking, spitting, biting, all kinds of other tics that were the result of accumulated tic impulses."  Ex. S at 32.

[3]  Ms. Tepsic is the School Board's Rule 30(b)(6) designee "regarding any and all policies, directives, rules, ordinances, laws or internal memorandum involving the use, implementation and training provided to employees regarding any form of physical restraint or hold, including Professional Crisis Management ("PCM") techniques, TEAM and VITAL and the use of any restraint of hold on C.M."  Ex. 3 8-11

Depo., Ex. 3 at 20; Joann Thornton[4] ("Thornton") Depo., Ex. C at 233.  "C.M.'s

aggression towards others is a learned behavior."  DE 48-1, ¶ 29.

5.     School records indicate that it was necessary to restrain C.M. to avoid injury to

himself or others.  Ex. I.  Each time C.M. was restrained, it was due to a

perceived crisis, rather than part of his behavioral management plan.  4/24/12

Hearing Transcript at 17, 71-73; Ex. 8.  C.M. was first restrained on March 17,

2004, when C.M. was in sixth grade.  Tepsic Depo., Ex. 3 at 15.  The restraint

logs from C.M.'s sixth grade are missing.  Ex. A at 129-30; Ex. L at 166.  The

only evidence of C.M. being restrained is the PCM Physical Assistance Logs

found in Ex. K.  At oral argument, it was stated by way of explanation that all

instances of restraint consisted of someone holding CM, for instance, either his

hands and/or his feet (without twisting his arms), and no mechanical restraint

was ever used on C.M.  4/24/12 Hearing Transcript at 14.

6.     For purposes of this motion only, the School Board concedes that, over a 14

month period of time, there were 89 incidents of restraint with 27 prone

restraints being documented.

---

[4] Ms. Thornton was the School Board's Rule 30(b)(6) designee in the DOAH
proceedings designated to testify as to the development and implementation of any
plan or program used to address the behavioral and discipline issues of C.M.,
including behavioral assessments, behavioral management plans, behavioral
interventions, positive behavioral techniques, compliance with the District's
Behavioral Management Procedures and the IDEA, any action or inaction taken by the
Behavior Review Committee, and implementation of same into C.M.'s Individual
Educational Plan.  Ex. 2 at 116; Ex. 4 at 6.

7.      After three restraints are performed within one month, a child's Functional

Behavioral Assessment ("FBA") must be reviewed, and updated if appropriate.

Ex. G; Thornton Depo. Ex. C at 174-75.  After three restraints were placed on

C.M., a new FBA was not conducted because "we knew what the function was

for him . . . but we did meet to go over the plan to see what was working and

what wasn't working.  After awhile we also – I requested that we have Merrill

Winston come in the capacity of a certified behavior analyst to help us out."

Thornton Depo. Ex. C at 174-75.

8.      The form of the majority of restraints performed on C.M. was taken from the

theories and instructions of the Professional Management Crisis Association

("PCMA").[5]  PCM is a behaviorly-based system using natural physical positioning

that avoids awkward movements.  Ex. H at 45.  PCM was adopted as the School

Board's policy on restraints or immobilization and PCMA has trained the School

Board's personnel to perform PCM techniques on students for 17 years.  Ex. 7 at

172-73.  Under PCM, if a student tries to hit, punch, or kick another, staff

attempts to deflect and transport, rather than restrain the student.  Ex. 3 at 24.

Sometimes, however, the student's physical aggression escalates quickly,

requiring the child to be restrained.  Ex. 3 at 57-58.

9.       C.M. "started going downhill" in the middle of seventh grade.  He did not want

to go to school and was crying a lot.  He regressed academically and

_____

[5]  PCMA provides crisis management and behavior analysis training,
certification, and  consulting.

behaviorally.  He had sleep problems, phobias and fears, and lost a lot of his

communication skills.  He started being aggressive at home.  Ex. A at 67-71.

10.    Pursuant to an Individual Educational Plan ("IEP"), C.M. attended Lantana

Middle School for sixth and seventh grades and part of eighth grade.  DE #s 42,

48-1.  A Behavior Intervention Plan ("BIP"), in effect as of April 2004, states:

"County approved restraints (TEAM) policies may be used if [C.M.] displays

continuous ag[g]ression or high magnitude disruption."  Ex. D, Bates stamp

P005555.  There is another copy of the BIP with the word "TEAM" blacked out.

A BIP is a working document and changes are usually made by hand.  Tepsic

Depo. at 16-17.

11.    Performing a TEAM restraint (now known as VITAL) is a crisis management

procedure used by the school police to insure safety and de-escalate target

behavior in emergency situations.  Tepsic Depo. at 18-20.; Ex. 7 at 177, Ex. 3

at 17-18, 59.  Thornton recommended that the TEAM restraint technique not

be performed on C.M.  Thornton Depo. at 178-79.

12.    During the time period of 2004 through 2007, both PCM and TEAM techniques

were used to restrain ESE students.  Tepsic Depo. at 13.  The School Board

preferred to use PCM techniques with ESE students, although the written

policies did not preclude TEAM techniques.  Exs. H, F, G.

13.     The PCM method does not preclude a horizontal restraint for someone such as C.M., who has gastrointestinal reflux, however, it is contraindicated.[6]  Ex. 5 at 200-02.  C.M.'s reflux condition could impose discomfort or pain when the prone restraint is imposed.  Ex. 5 at 205.

14.     The BIP became a part of C.M.'s IEP and was given to all of C.M.'s teachers and para-professionals.  Tepsic Depo. at 17-18.  It is unknown which version of the BIP was distributed.

15.     One PCM record reveals no reason why C.M. was restrained, who restrained him, or what type of restraint was performed.  Ex. 3 at 27-28.

16.     Another group of school records called "ABC Records," shows the antecedent occurrence ("A"), the behavior ("B"), and the consequence ("C").  One ABC record does not document the antecedent behavior, so it is not possible to tell what conduct of C.M. precipitated the restraint, or what de-escalation techniques were attempted.  Ex. 3 at 23-24.  Other ABC records show numerous instances of aggressive behavior by C.M. and what was done to de-escalate the situation; for example, whether C.M. was restrained or removed from the situation.  Ex. J.  One of these records show a TEAM technique was

---

[6] "Contraindication" means that the person performing the restraint should use extra caution.  Ex. 5 at 213.  All PCM instructors go over the list of contraindications in the PCM manual, and the instructors explain the reflux issue in their training.  Ex. 5 at 202, Ex. 3 at 69.  The reason why prone restraints are contraindicated for people with reflux is that if they are having acid reflux at the time of the restraint, this could cause them pain.  Ex. 5 at 205.

used.

17.   Actual restraint logs show that every restraint performed was in response to C.M.'s physical aggression (continuous), high magnitude disruption (continuous), and/or self-injury (continuous).  Def. Exs. J & K.

18.   School Board policy states, "[i]nterventions used in emergency situations to prevent a student from endangering self or others do not constitute management procedures and do not require parental consent."  Ex. G, Bates stamp P005472.

19.   Drs. Durgin and Myers diagnosed C.M. with post traumatic stress disorder, with the initial traumatizing event believed to be the restraints C.M. experienced at Lantana Middle School.  Ex. 1 at 42, 107-12; Ex. 13 at 10-111; Ex. 10 at 34-35.

20.   In 2009, Plaintiffs commenced an administrative due process proceeding.  The Administrative Law Judge ("ALJ") granted the School Board's motion to dismiss some of the claims that had been pled.  The parties later entered into a settlement.  Among other things, the Settlement and Release Agreement entered into between the parties provided:

> 9.   RESOLUTION OF DOAH CASE 09-1799E:  This AGREEMENT resolves all matters currently at issue and pending in DOAH Case No. 09-1799E; the only issues that can be raised between and among the PARTIES are either: (a) claims for future educational services, or (b) the claims raised by C.M. in the first amended due process petition and dismissed by that certain Order on the School Board's Second

Notice of Insufficiency and its Motion to
Dismiss Amended Complaint entered in DOAH
Case No. 09-1799E on June 5, 2009
("Dismissed Claims").

## STANDARDS FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id*. at 249.

The manner in which a party moving for summary judgment is required to discharge its initial burden can vary depending on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party does not bear the burden of proof at trial, as in this case, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to show affirmatively the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the

non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).

<u>DISCUSSION</u>

Plaintiffs make two statements in their Additional Statements of Undisputed Material Facts which merit highlighting:  "The issue on restraints is not whether the restraints were performed correctly, but why [they] were continuing to be used when it made C.M. worse."  DE 48-1, ¶¶48, 50.  They also state it is undisputed that "[n]o restraint was performed on C.M. for purposes of punishment or discipline."  DE 48-1 ¶ 61, Ex. 6 at 18.

<u>Section 504 of the Rehabilitation Act</u>

Count I alleges violation of § 504 of the Rehabilitation Act, which provides in pertinent part, "[n]o otherwise qualified individual with a disability in the United States ... shall, *solely by reason of her or his disability,* be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a)
(emphasis supplied). The elements of a claim under the Rehabilitation Act are,
therefore,: "(1) that [the plaintiff] is a 'handicapped individual' under the Act, (2)
that [he] is 'otherwise qualified' for the [benefit] sought, (3) that [he] was
[discriminated against] solely by reason of [his] handicap, and (4) that the program or
activity in question receives federal financial assistance." *Schiavo ex rel Schindler v.
Schiavo*, 358 F. Supp. 2d 1161, 1165 -66 (M.D. Fla. 2005) quoting *Grzan v. Charter
Hosp. of Northwest Indiana*, 104 F.3d 116, 119 (7th Cir. 1997).

   Plaintiffs allege that the School Board intentionally discriminated against C.M.
by refusing to investigate his individual needs, excluding him from participating in
educational activities with other non-disabled students, and purposefully provoking
him to de-compensation by subjecting him to prolonged and unwarranted restraints.
DE 26 ¶ 81. Plaintiffs assert the School Board acted in bad faith, with gross
misjudgment, and deliberate indifference, and they seek an injunction barring the
School Board from continuing its policy and practice of performing restraints to
address behavioral issues, as well as compensatory and punitive damages, fees and
expenses.

   The School Board moves for summary judgment as to Count I stating that even
if the Court completely accepts Plaintiffs' version of the facts, there is no evidence
of intentional discrimination or deliberate indifference. Under the standard of
deliberate indifference, a plaintiff must prove that the defendant knew that harm to

a federally protected right was substantially likely and that the defendant failed to act on that likelihood.  *T.W. ex rel. Wilson v. School Bd. of Seminole County, Fla.* 610 F.3d 588, 604 (11th Cir. 2010) ("*T.W.*").

The first question that must be decided is whether the School Board, as the moving party, has met its initial burden, and thus whether Plaintiffs, as the non-moving parties, had an obligation to produce any evidence in response.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  As a moving party which does not bear the burden of proof at trial, the School Board may satisfy this burden by pointing out that there is an absence of evidence in the record to support a judgment for Plaintiffs on Count I alleging a violation of § 504 of the Rehabilitation Act.  *See Fitzpatrick*, 2 F.3d at 1115–16.

The first question must be answered in the affirmative.  The School Board has pointed out that after completion of full discovery, Plaintiffs cannot point to any evidence whatsoever supporting their claim that the para-professionals or teachers who restrained C.M. intended[7] to discriminate against him on the basis of his

---

[7]  The definition of "intentional discrimination" in the § 504 special education context is unclear.  In 2010, the Eleventh Circuit stated that it "has not decided whether to evaluate claims of intentional discrimination under § 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (citing *Wood v. Pres. of Spring Hill College,* 978 F.2d 1214, 1218-20  (11th Cir. 1992)).  In this case, neither party contends that the discriminatory animus standard applies, and the arguments have been made under the deliberate indifference standard.  Accordingly, the court will analyze the claims under that standard, which is a more lenient standard than discriminatory animus.  *See J.D.P. v. Cherokee*

disability,[8] or knew that it was substantially likely that a violation of his federally protected rights would occur.  *T.W.*, 610 F.3d at 603-04; *Berg v. Fla. Dep't of Labor & Employment Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998).

Having met its initial burden, the burden shifts to Plaintiffs to point to record evidence, overlooked or ignored by the School Board, sufficient to withstand a directed verdict, or come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).  This Plaintiffs have failed to do.  The only evidence in the record are the restraint logs and ABC records at Exs. J & K.  These records show, for the most part, that C.M. was restrained due to his own aggressive or self-injurious behavior.  The records reveal nothing regarding the intent or knowledge of each person who restrained C.M.

Plaintiffs have not produced *any* evidence of intentional discrimination or deliberate indifference, an essential element of their Rehabilitation Act claim.  Surprisingly, there is no evidence from the para-professionals or teachers who signed the restraint logs or restrained C.M., although the School Board reports two of them are still employed by the School Board.  4/24/12 Hearing Transcript at 27.  Because

_____

*County, Ga. School Dist.*, 735 F. Supp. 2d 1348, 1365 (N.D. Ga. 2010) (analyzing a compensatory damages claim under § 504 using the deliberate indifference standard because the parties argued the case under that standard); *Saltzman v. Bd. of Commis of N. Broward Hosp. Dist.*, 239 F.App'x 484, 487 (11th Cir. 2007) (same).

   [8] There is no record evidence whatsoever from any of the people who applied the restraints.

Plaintiffs failed to carry their burden of setting forth evidence of specific facts

sufficient to withstand a directed verdict, summary judgment as to Count I alleging a

violation of § 504 of the Rehabilitation Act will be granted.[9]

**Substantive Due Process Liability Under 42 U.S.C. § 1983**

Count II alleges that C.M. had a liberty interest in his bodily integrity that is

protected under the Due Process Clause of the Fourteenth Amendment.  Plaintiffs

claim that the School Board's acts of repeated physical restraints and acts of

seclusion[10] against C.M. violated that right.[11]  Plaintiffs contend that by authorizing

---

[9]  This conclusion is consistent with the Court's previous order where it was stated "the School Board is correct that Plaintiffs have not produced evidence of intentional discrimination  or deliberate indifference." [DE 113 at 13]. Unfortunately, however, the Court then misapplied the initial burden standard for a party moving for summary judgment who does not have the burden of proof at trial.

[10]  Plaintiffs argue that "while at Lantana Middle School it was not uncommon for C.M. to be isolated from his classmates, teachers and staff by being left out in (sic) hallway, alone, without supervision, performing no school work. Ex. 9 at 151-52."  The record citation for this allegation, however, does not support this assertion, and no other evidence is proffered for this allegation.  As this argument is completely unsupported, it is disregarded.

[11]  Plaintiffs assert that the correct standard to determine whether C.M.'s substantive due process rights were violated comes from *Youngberg v. Romeo*, 457 U.S. 307, 330 (1982), which holds that "[l]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  In accordance with this theory of liability, Plaintiffs argue that the School Board departed from accepted professional standards of care by placing TEAM and prone restraints in C.M.'s BIP without parental or medical consent, and by failing to sufficiently document the number of restraints or the antecedent behavior before C.M. was restrained.  Other evidence to which Plaintiffs point is the fact that no FBA was conducted after more than three restraints were performed in a three month period,

the repeated restraints, the School Board engaged in arbitrary, egregious, and conscience-shocking behavior which demonstrates a "deliberate indifference" to the training and supervision of the School Board's subordinates who performed the acts of restraint.  Compl. ¶¶ 86-89.  "It is this blatant disregard of C.M. rights to be free from bodily restraints as provided under the 14th Amendment that proximately caused C.M. to suffer anxiety and trauma that was documented as being a direct result of the restraints at Lantana Middle School."  DE 48 at 8.

For this claim, Plaintiffs burden at trial will be to convince a reasonable jury to infer that C.M. was restrained based on an intent to discriminate against him because he has a disability.  It will not be enough to show that C.M. has a disability, the disability caused a problem that had to be addressed, and the School Board responded to the problem dissatisfactorily, or even harmfully.  Liability under the due process clause does not arise merely because someone cloaked with state authority

---

and that C.M.'s behavior resource teacher did nothing to determine the circumstances behind the restraints from the persons who performed them.

The Court agrees with the School Board that *Youngberg*, dealing with the rights of an involuntarily committed retarded child, is not the appropriate standard for this case.  "*Youngberg* and its progeny firmly established that mentally retarded individuals in state custody have, under the Fourteenth Amendment, liberty interests in 'reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.'"  *F.A. ex rel. Sims v. Hansen*, 2011 WL 4529463, *1 (N.D. Fla. Sept. 29, 2011) quoting *Youngberg*, 457 U.S. at 324. "[I]in a classroom setting, courts have not allowed due-process liability for deliberate indifference, and, moreover, will only allow recovery for intentional conduct under limited circumstances."  *Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373, 1378 (11th Cir. 2002) (instructing courts to remain vigilant in policing the boundaries separating tort law from constitutional law).

causes harm.  "As a general rule, to prevail on a claim of a substantive due-process

violation, a plaintiff must prove that a defendant's conduct 'shocks the conscience.'"

*Nix*, 311 F.3d at 1375 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 836

(1998)).  Allegations that a party failed to train, supervise, and discipline its

employees do not rise to the level of an "omission that can properly be characterized

as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of*

*Harker Heights, Tex.*, 503 U.S. 115, 128 (1992).  Nor do allegations of "deliberate

indifference" when they are made in a non-custodial setting such as a classroom.  *See*

*Nix*, 311 F.3d at 1377; *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir.

1997) (school children are not in a custodial relationship with the state).  Moreover,

as previously indicated, there is no evidence in the record to support a finding of

deliberate indifference to C.M.'s needs or of intentional discrimination based on his

disability.

      Evidence that records were lost, that a few records are incomplete, that the

School Board did not follow policy by failing to conduct a FBA after three restraints

were performed on C.M., and that the School Board knew of non-physical means to

stop C.M. but restrained him instead, thereby disregarding their own consultant's

advice to ignore C.M.'s slapping, does not approach the required constitutional level

of shocking the conscious.  Nor do the other examples Plaintiffs cite.[12]

---

[12] Plaintiffs exaggerate or ignore undisputed facts in their argument.  For
example, Plaintiffs argue that TEAM *restraints* were used when it is only documented

While the School Board acknowledges that C.M. was restrained a significant number of times, a substantive due process claim is not a valid attack of Defendant's conduct.  Viewing all inferences that could be drawn from all alleged actions or inactions in the light most favorably to Plaintiffs, as a matter of law, these facts do not rise to the requisite conscience shocking level.  There is no record evidence to support the claim that the use of restraints was arbitrary, egregious or excessive in the constitutional sense.  As no reasonable jury could conclude that the School Board's use of restraints was arbitrary, egregious or excessive in the constitutional sense, Count II fails as a matter of law and summary judgment will be granted on Count II.

**42 U.S.C. § 1983, Right to a Free and Appropriate Education under the IDEA**[13]

Count IV alleges that the School Board conspired to deprive C.M. of his right to a free and appropriate public education under the Individuals with Disabilities

---

to have been used once, that ABC *records* were not properly prepared when only one ABC record is incomplete, and complain that restraints were used without parental consent when the school policy that applies does not require parental consent. Furthermore, Plaintiffs state that they do not dispute that C.M. was not restrained for purposes of punishment or discipline, but argue that C.M. was restrained in a punitive manner, for extended periods of time, and often for trivial issues.

[13]  The IDEA guarantees all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs.  20 U.S.C. § 1400(d)(1)(A); *J.P. v. Cherokee County Bd. of Educ.*, 218 F. App'x 911, 913-914 (11th Cir. 2007); *Sch. Bd. of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir. 2002).

Education Act ("IDEA") by perpetuating and applying an unlawful policy and practice of implementing violative restraints into C.M.'s BIP/IEP, and failing to conduct the necessary and proper assessments and evaluations to determine the necessary and proper accommodations and/or services required under the IDEA to address his disabilities.  DE 26.  The School Board argues that this claim can not proceed because (1) it was not preserved by the parties' Settlement and Release Agreement;  (2) a § 1983 claim may not be brought for violations of the IDEA; and (3) there is no evidence to support the elements of a § 1983 IDEA claim.

In the original Order and Opinion, this Court rejected the first two arguments, and overlooked the third.  Upon reconsideration, the Court realizes that this third argument was propounded by incorporation and indeed, has merit.

Where damages are available under § 1983, courts have typically required plaintiffs to show that: (1) the school district violated the IDEA; (2) exceptional circumstances exist such that the district's conduct that caused the IDEA violation was persistently egregious and prevented or frustrated the plaintiff from securing equitable relief under the IDEA; (3) the district has a custom or practice that is the moving force behind the alleged IDEA violations; and (4) normal remedies offered under the IDEA, including compensatory education, are inadequate to compensate the plaintiff for the harm he or she allegedly suffered.  *Shelton v. Maya Angelou Public Charter School*, 578 F. Supp. 2d 83 (D. D.C. 2008) (noting that some courts consider only the first and third factors).  *Walker v. District of Columbia*, 157 F.

Supp. 2d 11, 30 (D. D.C. 2001); *R.S. v. District of Columbia*, 292 F. Supp. 2d 23, 28 (D. D.C. 2003).

As with the claim under Count I, Defendant has pointed out that, after completion of full discovery, there is no evidence to support any of the elements of a § 1983 IDEA claim.  In response, Plaintiffs have failed to carry their burden to show specific evidentiary facts that support this claim.  There being no evidence whatsoever to support a § 1983 IDEA claim, summary judgment is appropriate as to Count IV.

**Liability under the ADA, 42 U.S.C. § 12132**

Count VI (the last federal question claim) alleges that the School Board violated the Americans with Disabilities Act ("ADA") by excluding C.M. from participation in or denying the benefits of, services, programs, or activities of the School Board by reason of his disability, or subjecting him to discrimination by reason of his disability.  Section 12132 of the ADA states "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To establish a prima facie case of discrimination under the ADA, plaintiffs will have to show (1) that C.M. is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the services, programs, or

activities of the School Board or otherwise discriminated against by the School Board; (3) by reason of such disability.  *L.S. v. School Bd. of Broward County, Fla.*, No. 06-61245-CIV-KAM, 2007 WL 2827575, *7 (S.D. Fla. Sept. 26, 2007) quoting *Shotz v. Cates,* 256 F.3d 1077, 1079 (11th Cir. 2001); *Miller v. King*, 384 F.3d 1248, 1265 (11th Cir. 2004).  Once again, summary judgment is appropriate as to this count.  As discussed in the sections addressing Plaintiffs' claims under the Rehabilitation Act and Plaintiffs' § 1983 IDEA claim, there is no evidence of intent to discriminate which could support a reasonable juror's conclusion that the School Board's alleged actions were motivated by reason of C.M.'s disability.  *See Hollins v. Fulton County*, 422 F.App'x 828 (11th Cir. 2011) (affirming summary judgment for defendant in age discrimination case where evidence not sufficient for plaintiff to make out a prima facie case of discrimination); *Lewellyn v. Sarasota County School Board*, 2009 WL 5214983 (M.D. Fla. 2009) (granting summary judgment to school board since plaintiff came forward with no evidence that decisions regarding disabled child's education were the product of discrimination).

<u>State Claims</u>

Because all federal claims against the School Board are dismissed herein, the remaining potential state and common law claims will be also be dismissed (without prejudice).  The Court declines to exercise supplemental jurisdiction over these claims.  This Court derives its authority to decide Plaintiffs' federal claims from 28 U.S.C. § 1331, which provides that district courts have original jurisdiction over civil

actions "arising under the Constitution, laws, or treaties of the United States."  28

U.S.C. § 1331.  Federal courts are given the additional power to exercise

supplemental jurisdiction over state law claims which "form part of the same case or

controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

However, § 1367(c)(3) states that "[t]he district courts may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if ... the district court has

dismissed all claims over which it has original jurisdiction...."  *Id*. § 1367(c)(3).

The Eleventh Circuit has explicitly advised that a district court is well within

its discretion to dismiss state law claims once the basis for original federal court

jurisdiction no longer exists.  *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000); *see*

*also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 n.26

(11th Cir. 1997) ("After dismissing Panama's federal claims against the ... defendants,

the district court correctly dismissed its remaining state law claims against these

defendants"); *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 792 (11th Cir. 1991)

(recognizing that trial court's decision to exercise pendant jurisdiction over state law

claims is discretionary).

Since the Court has determined that the federal claims serving as the basis for

original federal court jurisdiction fail as a matter of law, the Court also concludes

that any potential state and common law claims should be dismissed without

prejudice so that Plaintiffs may, if they choose, pursue them in state court.

Therefore, because the School Board met its burden of pointing out to the district

court that there is an absence of evidence to support Plaintiffs' federal claims, and because Plaintiffs failed to meet their responsive burden of demonstrating through affidavits or other evidence that there is indeed a material issue of fact that precludes summary judgment, there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs.  *Clark*, 929 F.2d at 608.  Therefore, in accordance with the findings made above, it is hereby

ORDERED AND ADJUDGED that the Official-Capacity Defendants' Motion for Summary Judgment **[DE 42] is granted** as to all of Plaintiffs' federal claims.  Any claims based on state or common law are dismissed without prejudice.  Defendants' Motion for Summary Judgment on State Law Tort Claims **[DE 43] is denied as moot**, except the Court notes that Plaintiffs agreed during oral argument that Count III, alleging violation of Fla. Stat. § 1003.57, was settled in the underlying administrative proceeding.  4/24/12 Hearing Transcript at 59.  In accordance with Fed. R. Civ. P. 58, final judgment will be entered by separate order.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of January, 2013.

_____
KENNETH A. MARRA
United States District Judge